**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
─────────────────────────────────────

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                    **07-CR-127A(Sr)**

**ANTHONY ROY MONROE,**

        **Defendant.**
─────────────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

        The defendant, Anthony Roy Monroe, a/k/a Edwin George Horning ("the defendant"), is charged in an indictment with having violated Title 18 U.S.C. § 922(g)(1). (Docket #10).  He filed a motion to suppress evidence (Docket #17) which has been opposed by the government.  (Docket #18).  An evidentiary hearing on defendant's motion to suppress was held by this Court on December 17, 2007 and January 3, 2008, and transcripts of these proceedings were filed on January 16, 2008.  (Docket #s 29 and 30 respectively).

At the hearing, the government called the Hon. David Porter, Town Justice, Town of Allegany, Cattaraugus County, State of New York, the justice who issued the search warrant at issue herein authorizing the search of defendant's residence on January 31, 2007, and Cattaraugus Sheriff Officers Ronald Lott and Brandon Walters.

Thereafter, post-hearing memoranda were filed by the defendant (Docket #46) and the government (Docket #47) and the matter was taken under advisement.

## FACTS[1]

Sometime in January 2007, members of the Cattaraugus County Sheriff's Department ("CCSD") were conducting an investigation relating to the crimes of welfare fraud, forgery and identity theft in violation of New York Penal Law, Sections 158.15, 170.10-2, 190.78 and 190.79 allegedly perpetrated by the defendant.  (Docket #42, p. 1).

---

[1] The facts iterated herein are taken from the transcripts of testimony given at the suppression hearing (Docket #s 29 and 30) and the exhibits introduced at the hearing as well as the representations made by counsel in their supporting papers.  Reference to the transcripts is designated by "T1" with the appropriate page number(s) following for the testimony contained in the hearing transcript for the hearing conducted on December 17, 2007 (Docket #29) and by "T2" with the appropriate page number(s) following for the testimony contained in the hearing transcript for the hearing conducted on January 3, 2008 (Docket #30).

On or about January 17, 2007, Sergeant Lott requested a criminal history on Edwin G. Horning and Anthony Monroe, and it was determined that Horning had a record of prior arrests as did the defendant.  (*See* Government Exhibit 6).  This history indicated that the defendant had a prior felony conviction in Kings County Superior Court, State of New York in April 1991 for "criminal possession of a weapon" for which he was sentenced to five years probation.  A printout of this criminal history of the defendant (Government Exhibit 6) was made, and Sergeant Lott circled this conviction of the defendant and placed an asterisk within that circle so as to more or less highlight that conviction record of the defendant.  (T2. 30-31).

Detective Brandon Walters also reviewed this criminal history printout relating to the defendant (Government Exhibit 6) before the search warrant in question was executed on January 31, 2007 and, as a result, he knew that the defendant could not legally possess firearms under New York law because of this felony conviction.  (T2. 102-103, 112).  Shortly after the receipt of the defendant's criminal history (Government Exhibit 6) and before the execution of the search warrant at issue, Detective Walters called the court in which the felony conviction of the defendant had been entered in order "to verify that [the defendant] was convicted of this Class D felony."  Subsequently, certified written confirmation of this conviction was received.  (T2. 113, 116,131).

Based on the information contained in the aforesaid criminal history (Government Exhibit 6), "Sgt. Lott and Det. Walters called and requested fingerprint

cards and photos of all arrest (sic)."  These fingerprint cards were submitted to

Sergeant Bruce Bryant of the CCSD, an "identification specialist," with the request that

he compare the fingerprint card bearing the defendant's name with the fingerprint card

bearing the name "Edwin Horning."  (Defendant's Exhibit A).

On January 29, 2007, Sergeant Bryant "compared one inked fingerprint

card bearing the name of Edwin G. Horning . . . with a photocopy of an inked fingerprint

card . . . bearing the name of Anthony R. Monroe . . . and found that they positively

matched each other and were made by the same person."  (Government Exhibit 2).

Sergeant Bryant submitted a single page "Supporting Deposition General" as to this

comparison and his findings to Sergeant Lott and Detective Walters.  (Government

Exhibit 2).  However, the affirmation and signature of Sergeant Bryant on this

"Supporting Deposition" appears on the back side of the page without anything more on

that side of the page.  (*See* Government Exhibit 2).

On January 25, 2007, Sergeant Lott and Detective Walters "interviewed

Linda J. Horning, the wife of the real Edwin G. Horning" who had previously advised

Captain Robert Buckhardt of the CCSD on January 16, 2007 that the defendant "stole

her husband Edwin G. Hornings (sic) identity in 1991."  She stated that the defendant

"was a family friend" and that he "stole her husband's wallet with all of her husbands

(sic) identification in it" and that the defendant "has been living as Edwin G. Horning

ever since."  (Defendant's Exhibit A).  At this interview of January 25, 2007, Linda J.

Horning gave a written statement to the officers.  (Defendant's Exhibit A).  Interviews of

-4-

other witnesses were also conducted by Sergeant Lott and Detective Walters on January 25 and 30, 2007 who corroborated the belief that the defendant was representing himself as being "Edwin G. Horning."  (Defendant's Exhibit A).

On January 31, 2007, Sergeant Lott and Detective Walters interviewed the defendant at the CCSD office.  At 2:15 p.m. of that date, Sergeant Lott and Detective Walters presented a written "Advice of Rights" form to the defendant which included a written acknowledgment of his rights under the heading "WAIVER OF RIGHTS."  (Government Exhibit 3).  The defendant signed this "Advice of Rights" and his signature was witnessed by Sergeant Lott and Detective Walters at 2:18 p.m. on January 31, 2007.  At "2:55 p.m." on January 31, 2007, a statement was given by the defendant to Sergeant Lott and Detective Walters wherein he admitted that he had adopted the name of "Edwin G. Horning" and "made up a Social Security number."  He also admitted that he used this name "Edwin G. Horning" when he "applied for assistance at the Cattaraugus County Department of Social Services," and on a "Food Stamps Application with the Cattaraugus County Social Services," as well as in a "Medicaid Application with the Cattaraugus County Social Services" and a "Public Assistance Application" with that same agency.  The defendant also admitted that "a driver's license and Social Security card with the name Edwin G. Horning" were "in [his] wallet at home," even though he "knew it was someone elses (sic) name."  These admissions were reduced to a written statement which the defendant signed as did Sergeant Lott and Detective Walters as witnesses, which written statement also indicated that the interview of the defendant had been completed at 3:45 p.m. on

January 31, 2007.  (*See* Government Exhibit 3) (T2. 98-99).

The defendant was arrested and charged with "12 counts of forgery in the second degree, 2 counts of criminal impersonation second and 1 count of felony welfare fraud" on January 31, 2007.  (Defendant's Exhibit A).

After the defendant had been arraigned on the aforesaid state charges and detained pending posting of bail, Sergeant Lott undertook the preparation of an application for a search warrant of defendant's residence located at 3936 Church Road in the Town of Allegany, Cattaraugus County, State of New York.  (Government Exhibit 1).  He first attempted to reach fellow officers who were more experienced with search warrants for the purpose of receiving assistance in the preparation of the search warrant application for the search warrant of defendant's residence but was unsuccessful in reaching them.  (T2. 87).  The reason for this attempt at obtaining help was that this was his first experience in applying for a search warrant (T2. 10) and the fact that he had never received any training on applying for search warrants.  (T2. 35-36).  Detective Walters was not able to be of assistance in preparing the application since he as well had no prior experience or training in the process of applying for and obtaining a search warrant.  (T2. 106, 121, 124-125).  As a result, Sergeant Lott undertook the preparation of the search warrant application on his own since he considered time to be of the essence in that he feared that the defendant might cause the documents they were seeking to be destroyed.  Therefore, he "didn't wait for a more experienced person to help [him]."  (T2. 91, 93, 106).  He put everything in the

application for the search warrant (Government Exhibit 1) that he "believed had to be included with (sic) the application."  (T2. 87).

On January 31, 2007, he and Detective Walters proceeded to the office of Town of Allegany Justice Porter for the search warrant because he "couldn't get ahold (sic) of the County Court Judge, Larry Himelein" and Judge Porter "had the (sic) geographical jurisdiction where the residence was that [he] wanted to search."  (T2. 9-10, 96).  In addition to the search warrant application (Government Exhibit 1), Sergeant Lott also brought the following documents for submission to Judge Porter: the statement of the defendant "along with a Miranda warnings waiver (Government Exhibit 3); a *copy* of the "Supporting Deposition from Sergeant Bruce Bryant of the Sheriff's Department" (Government Exhibit 2); and the search warrant in question (Government Exhibit 4).  (T2. 11-12, 15, 99).

Judge Porter met with Sergeant Lott and Detective Walters on January 31, 2007 regarding the "application for a search warrant" seeking authorization to search the defendant's residence at 3936 Church Road in the Town of Allegany, New York.  (T1. 9).  At the time of this meeting, Judge Porter, who is *not an attorney*, had been a Town Justice for approximately one (1) year.  (T1. 8). The search warrant application presented to him by Sergeant Lott was the *first* application for a search warrant ever presented to him although he had received two (2) weeks training on the issuance of search warrants.  (T1. 12-13, 26, 30, 38).

Although the Application For Search Warrant (Government Exhibit 1) merely describes the location of the residence to be searched as "3936 Church Road in the Town of Allegany," Town Justice Porter testified that he was not aware of any other Town of Allegany in the State of New York, nor was he aware of one in Pennsylvania. (T1. 18).  He did state that he "personally recognized the address, 3936 Church Road in the Town of Allegany" because when he "ran for public office, [he] made it [his] business to visit all 3100 people who live in the jurisdiction that was (sic) capable of voting for [him]" and there was no "question in [his] mind that the address 3936 Church Road in the Town of Allegany was in the Town of Allegany, New York.: (T1 19, 49).

In addition to the Application For Search Warrant (Government Exhibit 1), Sergeant Lott presented the "supporting deposition" signed by Bruce Bryant of the Cattaraugus County Sheriff's Department (Government Exhibit 2) to Town Justice Porter which "to the best of [Town Justice Porter's] knowledge, he reviewed" and "did have in [his] possession" and did discuss it with Sergeant Lott and Detective Brandon Walters before he signed the search warrant in question.  (T1. 17, 22-23, 24, 28, 55, 88, 100-101).  However, because this "supporting deposition" (Government Exhibit 2) was not later found in his court file, along with Government Exhibits 1, 3 and 4, he admitted on cross-examination that he "does not know whether [he] received [it]," because if he "had received it, a copy would have been put in the court file."  He could not give a reason as to why this "supporting deposition" was not in the court file along with government Exhibits 1, 3 and 4.  (T1. 13-14, 15, 22-23, 24, 28, 29, 32, 34, 35)

Sergeant Lott testified that while it was his intention to leave a copy of the "supporting deposition" (Government Exhibit 2) with the court for inclusion in the court file, he apparently took the document with him when he left the court.  (T2. 27-28).

Detective Walters testified that he was present with Sergeant Lott when Sergeant Lott presented the "supporting deposition" (Government Exhibit 2) to Town Justice Porter on January 31, 2007.  (T2. 99-101, 131).

None of the exhibits, Government Exhibits 2, 3 and 4, were attached to the Application For Search Warrant (Government Exhibit 1) when they were presented to Town Justice Porter on January 31, 2007.  (T1. 4-5; T2. 48).

Nevertheless, Town Justice Porter, Sergeant Lott and Detective Walters all testified that a discussion was had with Town Justice Porter about the "supporting deposition" (Government Exhibit 2) before the search warrant (Government Exhibit 4) was signed.  (T1. 15-16, 17, 28, 55, 65; T2. 22-23, 100).

Sergeant Lott and Detective Walters also discussed the "Advice of Rights" document and attached statement of the defendant (Government Exhibit 3) with Town Justice Porter before the search warrant (Government Exhibit 4) was signed.  (T1.12; T2. 22, 100-101, 109).  In addition to such discussion, Town Justice Porter read the "Advice of Rights" document and attached statement of the defendant (Government Exhibit 3) before he signed the search warrant (Government Exhibit 4).  (T1. 12, 21, 33,

50-51, 60; T2. 100-101).

At no time during all of the discussions between Town Justice Porter and Sergeant Lott and Detective Walters were Sergeant Lott and Detective Walters under oath. (T1. 25, 28, 31).  In response to the Court's question to him, Town Justice Porter testified that all of his discussions with Sergeant Lott and Detective Walters took place *before* he administered the oath to Sergeant Lott in the execution of the Application For Search Warrant (Government Exhibit 1).  (T1. 72).

Upon completion of the aforesaid discussions, Sergeant Lott signed and swore to the truthfulness of the Application For Search Warrant (Government Exhibit 1) before Town Justice Porter, and Town Justice Porter signed it.  (T1. 9-10, 25; T2. 21).

Although the Application For Search Warrant (Government Exhibit 1) states in paragraph D thereof that there was "a fingerprint comparison of Anthony Monroe to an Edwin Horning," Sergeant Lott testified that the Application was incorrect in that he "phrased" that paragraph "wrong in the Application" since he "didn't physically have the fingerprints with [him] and therefore, no fingerprint comparison was shown to Town Justice Porter at the time of the application for the search warrant.  (T2. 49-51, 110).

Town Justice Porter issued the search warrant (Government Exhibit 4) "based solely on the information conveyed to [him] by Sergeant Lott and Detective

Walters." (T1. 63). It was his understanding that the items described and sought in the search warrant application (Government Exhibit 1) related to "any type of identity theft" and "fraudulent of (sic) obtaining goods or services that were not entitled to you (sic), including driver's licenses, whatever." (T1. 20-21).

Although the warrant application sought permission for execution of the search warrant "at any time day or night" (Government Exhibit 1), Town Justice Porter did not grant this request and restricted the execution of the warrant to the hours of 6 a.m. to 9 p.m.. (T1. 35; T2. 24, 101) (Government Exhibit 4).

No notes or recordings of any kind were made by Town Justice Porter of this proceeding which lasted approximately forty-five (45) minutes. (T1. 20, 26, 32; T2. 23).

After Town Justice Porter signed the search warrant for the premises located at 3936 Church Road, Town of Allegany, Sergeant Lott and Detective Walters proceeded to that location on January 31, 2007 and conducted a search of the premises for the purpose of "looking for false identification identifying [the defendant] as Edwin Horning." (T2. 32). During the course of the search, a number of firearms were found in a bedroom which could be seen upon entry into that bedroom. (T2. 32-33, 104-105. Additional firearms were "found in a top dresser drawer" and "in two plastic totes." (T2. 32, 104-105). Six weapons were seized from this residence. (T2. 129). They were seized "because it was illegal for [the defendant] to possess them under

state law" because of his prior felony convictions.  (T2. 76-77).  It is this evidence that the defendant seeks to have suppressed.


## DISCUSSION AND ANALYSIS

This is a classic case of the "blind leading the blind" because of the inexperience of both the police officers and the town justice with respect to the obtaining and issuing search warrants.


Although the search warrant at issue is a state warrant issued by a New York State Town Justice based upon a sworn application of a sheriff's deputy, review of the validity of the search warrant in question must be had solely in the context of the Fourth Amendment to the United States Constitution where the evidence seized pursuant to that warrant is to be employed in a federal prosecution.  *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993); *see Preston v. United States*, 376 U.S. 364 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers").


It is this Court's opinion that the entire process in seeking the search warrant and in the issuance of the search warrant was so flawed so as to make the search warrant invalid.

The core issue to be decided in this case is whether the evidence seized pursuant to the search warrant at issue should be suppressed so as to "further the purpose of the exclusionary rule."  *United States v. Leon*, 468 U.S. 897, 918 (1984).

The Fourth Amendment to the United States Constitution expressly provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."  U.S. Const. amend IV.  A similar requirement is found in Rule 41(e)(2) of the Fed. R. Crim. P.

*Leon* addressed the question of "whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause" (468 U.S. 900) by finding that "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong'."  (Citation omitted)  Id. at 906.  The Court went on to state that "[w]hether the exclusionary sanction is appropriately imposed in a particular case, . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct'." (Citation omitted).  *Id.* at 906.

Because the Court's rationale in *Leon* so clearly applies to the facts and circumstances of the case at bar, I have deliberately sacrificed brevity by quoting at length from the Court's opinion.

> The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980). An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. Stone v. Powell, 428 U.S., at 490, 96 S.Ct., at 3050. Indiscriminate application of the exclusionary rule, therefore, may well "generat[e] disrespect for the law and administration of justice." Id., at 491, 96 S.Ct., at 3051. Accordingly, "[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." United States v. Calandra, supra, 414 U.S., at 348, 94 S.Ct., at 670; see Stone v. Powell, supra, 428 U.S., at 486-487, 96 S.Ct., at 3048-3049; United States v. Janis, 428 U.S. 433, 447, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976).
>
> Close attention to those remedial objectives has characterized our recent decisions concerning the scope of the Fourth Amendment exclusionary rule. The Court has, to be sure, not seriously questioned, "in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate...." Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); Stone v. Powell,

supra, 428 U.S., at 492, 96 S.Ct., at 3051. Nevertheless, the balancing approach that has evolved in various contexts-including criminal trials - "forcefully suggest[s] that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." Illinois v. Gates, 462 U.S., at 255, 103 S.Ct., at 2340 (White, J., concurring in judgment).

\*     \*     \*

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,' " United States v. Chadwick, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977) (quoting Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)), we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965). See Aguilar v. Texas, 378 U.S., at 111, 84 S.Ct., at 1512. Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination. Spinelli v. United States, 393 U.S., at 419, 89 S.Ct., at 590. See Illinois v. Gates, 462 U.S., at 236, 103 S.Ct., at 2331; United States v. Ventresca, supra, 380 U.S., at 108-109, 85 S.Ct., at 745-746.

Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).   Second, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve

merely as a rubber stamp for the police." Aguilar v. Texas, supra, 378 U.S., at 111, 84 S.Ct., at 1512. See Illinois v. Gates, supra, 462 U.S., at 239, 103 S.Ct., at 2332. A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-327, 99 S.Ct. 2319, 2324-2325, 60 L.Ed.2d 920 (1979).

Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." Illinois v. Gates, 462 U.S., at 239, 103 S.Ct., at 2332. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Ibid. See Aguilar v. Texas, supra 378 U.S., at 114-115, 84 S.Ct., at 1513-1514; Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, Illinois v. Gates, supra, 462 U.S., at 238-239, 103 S.Ct., at 2332-2333, or because the form of the warrant was improper in some respect.

Only in the first of these three situations, however, has the Court set forth a rationale for suppressing evidence obtained pursuant to a search warrant; in the other areas, it has simply excluded such evidence without considering whether Fourth Amendment interests will be advanced. To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to

ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.

Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.  Many of the factors that indicate that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers  apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments. One could argue that applying the exclusionary rule in cases where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations or "magistrate shopping" and thus promotes the ends of the Fourth Amendment. Suppressing evidence obtained pursuant to a technically defective warrant supported by probable cause also might encourage officers to scrutinize more closely the form of the warrant to point out suspected judicial errors.  We find such arguments speculative and conclude that suppression of evidence obtained pursuant to a warrant should be ordered on a case-by-case basis and

only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.

\*     \*     \*

As we observed in Michigan v. Tucker, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974), and reiterated in United States v. Peltier, 422 U.S., at 539, 95 S.Ct., at 2318:

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

The Peltier Court continued, id., at 542, 95 S.Ct., at 2320:

> "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

See also Illinois v. Gates, 462 U.S., at 260-261, 103 S.Ct., at 2344 (White, J., concurring in judgment); United States v. Janis, supra, 428 U.S., at 459, 96 S.Ct., at 3034; Brown v. Illinois, 422 U.S., at 610-611, 95 S.Ct., at 2265-2266 (Powell, J., concurring in part). In short, where the officer's conduct is objectively reasonable, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable

way; for it is painfully apparent that ... the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." Stone v. Powell, 428 U.S., at 539-540, 96 S.Ct., at 3073-3074 (White, J., dissenting).

This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most  such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." Id., 428 U.S., at 498, 96 S.Ct., at 3054 (Burger, C.J., concurring). Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. "[S] earches pursuant to a warrant will rarely require any deep inquiry into reasonableness," Illinois v. Gates, 462 U.S., at 267, 103 S.Ct., at 2347 (White, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." United States v. Ross, 456 U.S. 798, 823, n. 32, 102 S.Ct. 2157, 2172, n. 32, 72 L.Ed.2d 572 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. Harlow v. Fitzgerald, 457 U.S. 800, 815-819, 102 S.Ct. 2727, 2737-2739, 73 L.Ed.2d 396 (1982), and it is clear that in some circumstances the officer  will have no reasonable grounds for believing that the warrant was properly issued.

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Brown v. Illinois, 422 U.S., at 610-611, 95 S.Ct., at 2265-2266 (Powell, J., concurring in part); see Illinois v. Gates, supra, 462 U.S., at 263-264, 103 S.Ct., at 2345-2346 (White, J., concurring in the judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid. Cf. Massachusetts v. Sheppard, 468 U.S., at 988-991, 104 S.Ct., at 3428-3430.

*Id.* at 908-923.


The principles and rationale iterated in *Leon* were recently reaffirmed by the

United States Supreme Court in *Herring v. United States*, 555 U.S. _____ (slip

opinion), 172 L.Ed.2d 496 (2009), 129 S.Ct. 695 wherein the Court stated:


> Our cases establish that . . . suppression is not an automatic consequence of a Fourth Amendment violation.  Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct.
>
> \*     \*     \*
>
> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," but "contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Arizona v. Evans*, 514 U.S. 1, 10 (1995).  Nonetheless,

our decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial.  See, *e.g., Weeks v. United States*, 232 U.S. 383, 398 (1914).  We have stated that this judicially created rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974).

In analyzing the applicability of the rule, *Leon* admonished that we must consider the actions of all the police officers involved.  468 U.S., at 923, n. 24 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination").

*        *        *

1.  The fact that a Fourth Amendment violation occurred - *i.e.*, that a search or arrest was unreasonable - does not necessarily mean that the exclusionary rule applies. *Illinois v. Gates*, 462 U.S. 213, 223 (1983).  Indeed, exclusion "has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and our precedents establish important principles that constrain application of the exclusionary rule.

First, the exclusionary rule is not an individual right and applies only where it "result[s] in appreciable deterence."  *Leon, supra*, at 909 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).  We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation.  *Leon, supra*, at 905-906; *Evans, supra*, at 13-14; *Pennsylvania Bd. Of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998).  Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future.  See *Calandra, supra*, at 347-355; *Stone v. Powell*, 428 U.S. 465, 486 (1976).

In addition, the benefits of deterrence must outweigh the costs. *Leon, supra*, at 910.  "We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence."  *Scott, supra*, at 368.  "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs."  *Illinois v. Krull*, 480 U.S. 340, 352-353 (1987) (internal quotation marks omitted).

\*     \*     \*

These principles are reflected in the holding of *Leon*: When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted "in objectively reasonable reliance" on the subsequently invalidated search warrant.  468 U.S., at 922.  We (perhaps confusingly) called this objectively reasonable reliance "good faith," *Ibid.*, n. 23.  In a companion case, *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), we held that the exclusionary rule did not apply when a warrant was invalid because a judge forgot to make "clerical corrections" to it. *Id.*, at 991.

. . . Finally, in *Evans*, 514 U.S. 1, we applied this good-faith rule to police who reasonably relied on mistaken information in a court's database that an arrest warrant was outstanding.  We held that a mistake made by a judicial employee could not give rise to exclusion for three reasons: The exclusionary rule was crafted to curb police rather than judicial misconduct; court employees were unlikely to try to subvert the Fourth Amendment; and "most important, there [was] no basis for believing that application of the exclusionary rule in [those] circumstances: would have any significant effect in deterring the errors.  *Id.*, at 15.  *Evans* left unresolved "whether the evidence should be suppressed if police personnel were responsible for the error, an issue not argued by the State in that case, *id.*, at 16, n. 5, but one that we now confront.

2.  The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct.  As we said in *Leon*, "an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus" of applying the exclusionary rule.  468 U.S., at 911. Similarly, in *Krull*, we elaborate that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amedment."  480 U.S., at 348-349 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).

\*     \*     \*

. . . ("[T]he deterrent value of the exclusionary rule is most likely to be effective" when "official conduct was flagrantly abusive of Fourth Amendment rights").

Indeed, the abuses that give ruse to the exclusionary rule featured intentional conduct that was patently unconstitutional.

*     *     *

3.  To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.  As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.  The error in this case does not rise to that level.

Our decision in *Franks v. Delaware*, 438 U.S. 154 (1978), provides an analogy.  Cf. *Leon, supra*, at 914.  In *Franks*, we held that police negligence in obtaining a warrant did not even rise to the level of a Fourth Amendment violation, let alone meet the more stringent test for triggering the exclusionary rule.

*Id.*  L.Ed.2d at 502-507.

The search warrant at issue herein (Government Exhibit 4) fails to contain any reference indicating for what crime the investigation and search are being undertaken. The warrant also fails to contain any reference by incorporation or otherwise to the sworn Application For Search Warrant (Government Exhibit 1), and the parties stipulated that no exhibits were physically attached to either the application or the search warrant. (*See United States v. George*, 975 F.2d 72, 75-76 (2d Cir. 1992).  Further, the address of the premises to be searched is incomplete in the warrant in that it does not indicate what state, if any, the property is located and fails to describe with any specificity, other than an address in the "Town of Allegany" the exterior of the premises to be searched.

Although the search warrant erroneously indicates that it is being issued from "Supreme Court, County of Cattaraugus, State of New York," I do not consider this error

to be substantive in nature since Judge Porter, as a Town Justice, is authorized by law to issue search warrants.

The Application For Search Warrant (Government Exhibit 1) is also deficient. It is a form application that merely references "(Sec. 690.35) CPL" which is Section 690.35 of the New York Criminal Procedure law that describes what should be contained in the Application For Search Warrant and to whom the application should be made. However, the Application (Government Exhibit 1) fails to reference a criminal statute allegedly violated or describe what crime is being investigated.

In the opening paragraph of the Application (Government Exhibit 1), Sergeant Lott merely states "that there is reasonable cause to believe that property of a kind or character described in section 690.10 of the Criminal Procedure Law may be found . . . ." Section 690.10 of the New York Criminal Procedure Law ("CPL") merely describes under what circumstances "personal property is subject to seizure pursuant to a search warrant." He fails to "particularly" describe how the property sought to be seized is subject to seizure pursuant to Section 690.10 CPL.

Further, the Application (Government Exhibit 1) fails to "particularly" describe the location of the premises to be searched in that it fails to state in which state the premises are located.

The references to Sergeant Lott's basis for his belief that probable cause existed for the issuance of the search warrant erroneously includes "a finger print comparison of Anthony Monroe to an Edwin Horning" since Sergeant Lott testified that "the finger print comparison" was not shown to Judge Porter at the time he presented the Application (Government Exhibit 1).  (T2. 50-51, 110).  The Application (Government Exhibit 1) does not incorporate by reference the documents (Government Exhibits 2 and 3) that he describes in paragraph "D" of the Application; nor were those documents attached to the Application when presented to Judge Porter.

The procedure used by Judge Porter in questioning Sergeant Lott and Detective Walters about their investigation and the basis for their belief that there was probable cause to support the issuance of the search warrant was defective since they were never placed under oath by the judge before engaging in the conversations as required by the Fourth Amendment and Section 690.35 of the New York CPL.  (*See also* Rule 41(d)(2)(A)).  Also, Judge Porter failed to record the proceedings or make detailed notes with respect to same as required under Sections 690.35(1) and 690.36(3) of the New York CPL.  (*See also* Rule 41(d)(2)(C) of the Fed. R. Crim. P.).  However, Town Justice Porter could have drawn such reasonable inferences from the material supplied by Sergeant Lott under the "totality of the circumstances analysis."  *Illinois v. Gates*, 462 U.S. 213 (1983).

Nevertheless, the resulting deficiencies in the search warrant application process due to Judge Porter's lack of knowledge and experience do not warrant the

suppression of the evidence seized by the officers pursuant to the defective search warrant since suppression "is not necessary meaningfully to inform judicial officers of their errors" and it "cannot [be] conclude[d] that admitting evidence pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests."  *Leon, supra* at 917.  "The exclusionary rule was crafted to curb police rather than judicial misconduct . . ."  *Herring, supra* at 505.

Having observed the demeanor of Judge Porter and having heard his testimony at the evidentiary hearing on December 17, 2007, I find that he was credible in believing that he was following proper procedure in examining Sergeant Lott and Detective Walters before issuing the search warrant and that he properly considered the information contained in the documents submitted to him (Government Exhibits 1, 2 and 3) in finding probable cause for the issuance of the search warrant.  Further, I find that Judge Porter acted in a "neutral and detached" fashion when presented with the warrant application and did not act "as an adjunct law enforcement officer" or as a "rubber stamp for the police officers."  *Leon, supra* at 914.  In fact, he rejected the request that would allow the officers to execute the warrant in the nighttime.  (*See* Government Exhibits 1 and 4) (T2. 24, 101).

I have also considered the demeanor and testimony of Sergeant Lott and Detective Walters given at the evidentiary hearing on January 3, 2008 and find that both

officers are credible in their belief that they had complied with the requirements of the law in applying for the search warrant at issue.  Nothing was presented at the hearing to substantiate a claim that the officers acted with "reckless disregard for the truth" or "knowingly" presented false or "misleading" information to Judge Porter when making application for the search warrant.  (*See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000); *Franks v. Delaware*, 438 U.S. 154, 171-172 (1978).

I find that Judge Porter acted in "good faith," albeit, erroneously in granting the application for the search warrant as a result of the flawed process described above.  I further find that Sergeant Lott and Detective Walters also acted in "good faith" in relying on the search warrant issued by Judge Porter notwithstanding the deficiencies in the Application For Search Warrant (Government Exhibit 1) as described aforesaid, as a result of their lack of knowledge, training and experience.  In keeping with the spirit of the Supreme Court's rationale in *Herring, supra*, that negligence of police officers does not constitute a basis for suppressing evidence, innocent ignorance or lack of knowledge or experience on the part of the police officers who believe they are complying with the law, should not be a basis for suppressing the evidence in this case.  Admittedly, more experienced or properly trained police officers would have or should have known that the search warrant application process under the totality of the circumstances in this case was defective.  However, the actions of Sergeant Lott and Detective Walters must be judged on whether they "acted in objectively reasonable reliance" on an invalid search warrant.  *Herring, supra* at 172 L.Ed.2d 505; *Leon, supra* at 922.

> [E]vidence should be suppressed only if it can be said that the law
> enforcement officer had knowledge, or may properly be charged
> with knowledge, that the search was unconstitutional under the
> Fourth Amendment.

*United States v. Peltier*, 422 U.S. 531, 542 (1975); *Illinois v. Krull*, 480 U.S. 340, 348-349 (1987); *Herring v. United States, supra* at 506.

The conduct of Sergeant Lott and Detective Walters cannot be said to be "flagrant" of "deliberate" violations of the defendant's rights under the Fourth Amendment.  Sergeant Lott testified that since this was his first search warrant application, he attempted to obtain help from more experienced officers but was unsuccessful in that endeavor.  (T2. 87).  Because he was concerned that the documents to be seized at the defendant's residence might be destroyed by the defendant's wife, if the defendant had called her after his arrest, Sergeant Lott "didn't wait for a more experienced person to help [him]."  (T2. 91, 93, 106).  As a result, he prepared the application on his own and included the information that he "believed had to be included with the application."  (T2. 87).

Sergeant Lott recognized his lack of training and inexperience in preparing applications for search warrants and therefore attempted to seek assistance in this endeavor from more experienced officers but was unsuccessful in that attempt.  (T2. 87).  He used a prescribed form that was utilized by the CCSD in making application for the search warrant (Government Exhibit 1) and attempted to apply for the search warrant before County Court Judge Larry Himelein but he "couldn't get ahold of [him]."

(T2. 10).  As a result, he went to Town Just Porter for the search warrant since Porter

"had the (sic) geographical jurisdiction where the residence was that [he] wanted to

search."  (T1. 10).  He presented Government Exhibits 2 and 3 along with the

Application For Search Warrant (Government Exhibit 1) to Town Justice Porter for his

review in determining whether there was probable cause for the issuance of the warrant

(T2. 11-12, 15) and Judge Porter reviewed those documents before issuing the search

warrant.  (T1. 12, 33, 50-51, 60).  The judge placed Government Exhibits 1, 3 and 4 in

the court file but apparently Government Exhibit 2 was erroneously taken back by

Sergeant Lott and therefore not included in that file.  There is nothing in this Court's

record to indicate that Sergeant Lott or Detective Walters withheld any information from

Judge Porter or that they knowingly, recklessly or intentionally misrepresented anything

so as to cause the judge to issue the search warrant.  The only failure Sergeant Lott and

Detective Walters were guilty of was the lack of knowledge due to no training and the

lack of experience in applying for and obtaining search warrants.

This lack of knowledge and experience is not "sufficiently deliberate" so as to

"trigger the exclusionary rule;" nor is it "sufficiently deliberate that exclusion can

meaningfully deter it, and sufficiently culpable that such deterrence is worth the price

paid by the justice system."  *Herring, supra*, 172 L.Ed.2d at 507.  The actions of

Sergeant Lott and Detective Walters do not constitute "deliberate, reckless, or grossly

negligent conduct" and therefore, it is RECOMMENDED that defendant's motion to

suppress the evidence seized pursuant to the search warrant at issue herein be in all

respects DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>**Failure to comply with**</u>

-30-

**the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning**

**objections to a Magistrate Judge's Report, Recommendation and Order), may**

**result in the District Judge's refusal to consider the objection.**

*S/ H. Kenneth Schroeder, Jr.*
H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

DATED:   March 17, 2009
Buffalo, New York